**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>CINEWORLD GROUP PLC, *et al.*,[1] | Chapter 11<br><br>Case No. 22-90168 (MI)<br><br>(Jointly Administered) |
| National CineMedia, LLC,<br><br>               Plaintiff,<br><br>      v.<br><br>Regal Cinemas, Inc.,<br><br>               Defendant. | Adv. Pro. No. _____ |

## COMPLAINT

Plaintiff National CineMedia, LLC ("NCM"), by its undersigned counsel, states as its Complaint against Defendant Regal Cinemas, Inc. ("Regal"), as follows:

## SUMMARY OF ACTION

1.     NCM brings this action to enforce its long-standing exclusivity, non-competition, non-negotiation, and confidentiality rights against Regal – rights that Regal has already breached and has promised to further breach, rights whose breach would have devastating consequences to NCM, and rights that would survive any attempted rejection by Regal.  As indicated in its Motion for Adequate Protection, ECF 433, NCM has been prepared to file this adversary proceeding from

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/cineworld.  The location of Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is: 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

the first days of these cases – but had held off at Regal's request that instead NCM make an offer so the parties could negotiate.  That request was apparently a subterfuge, as tonight Regal filed the *Debtors' Motion for an Entry of An Order (I) Authorizing the Rejection of a Certain Exhibitor Services Agreement, and (II) Granting Related Relief* (the "<u>Rejection Motion</u>"), ECF 576, without waiting for an intended offer from NCM.  The Rejection Motion makes the need for the relief in this adversary proceeding even more pressing.

2.      NCM, initially formed as a joint venture between Regal and two other major movie theater chains, currently is North America's largest cinema advertising network.  It derives its revenue principally from the sale of advertising to national, regional, and local businesses to be displayed on a national digital network within theater exhibitors through (a) the "Noovie" pre-show – NCM's on-screen, cinema advertising and entertainment platform seen on movie screens across the United States prior to the start of a movie – and (b) its lobby entertainment network – a series of strategically-placed screens located in movie theater lobbies and other advertising and promotions in theater lobbies.  In the ordinary course of business, NCM provides these advertising services remotely, without the involvement of Regal or its personnel.

3.      Since February 13, 2007, NCM and Regal have set out their obligations to one another through an Exhibitor Services Agreement (as amended, the "<u>Regal ESA</u>"), as well as through certain ancillary agreements.  A true and correct copy of the publicly-available version of the Regal ESA (which redacts certain pricing terms) is attached hereto as Exhibit A.

4.      Under the Regal ESA, NCM serves as the exclusive advertising service provider for all Regal theaters located in the United States (subject to certain narrow exceptions not at issue here).  Regal, in turn, receives a monthly theater access fee from NCM.  The Regal ESA contains a negative and a positive exclusivity provision, a non-competition provision, a non-negotiation

clause, and a confidentiality provision, among others, which are material terms critical to NCM's business model and the basis of its capital structure.

5.  The NCM relationship produces significant cash flow for Regal.  To date, NCM has made total payments to Regal of approximately $1.3 billion, and the average annual payment that NCM made to Regal from 2015 to 2019 under the Regal ESA and ancillary agreements was approximately $58 million.  Given its relationship with Regal and two of the other biggest movie theater chains in the country, NCM has been able to capture significant market share and establish itself as a major player in this industry.  In 2021, over 250.7 million people attended theaters in NCM's network, representing approximately one-half of the total movie theater attendance in the United States.  Given NCM's significant market share, its network provides an attractive platform for national advertisers who want exposure in larger markets or on a national basis.

6.  Unfortunately, the COVID-19 pandemic had a devastating effect on the movie theater industry, as movie-goers engaged in social distancing and stopped going to the theater.  The pandemic is now abating, however, and the industry expects a resurgence as the public continues to become more comfortable attending in-person activities again.[2]

7.  Nevertheless, despite the parties' successful relationship in the past, and the expected recovery in the theater industry, Regal has stated that it will undertake one of three options, each of which will involve breaching critical terms in the Regal ESA.  Regal  intends to either (1) rewrite a new deal with NCM with better terms for Regal; (2) enter into a new agreement with one of NCM's biggest competitors, Screenvision LLC ("Screenvision"), or another third

---

[2] *See, e.g.*, Brooks Barnes, *Pandemic-battered movie theaters are feeling good after a strong June*, N.Y. TIMES (July 1, 2022), https://www.nytimes.com/2022/07/01/business/media/movie-theaters-june.html ("[B]ox office analysts say there is now enough evidence for a clear assessment: Moviegoing in the United States and Canada is out of intensive care and headed toward something that even resembles health.").

party; or (3) bring in-house at Regal some or all of the services NCM currently provides under the Regal ESA.

8.      Regal's selection of any one of the three options would breach the Regal ESA (which was just renegotiated between the parties in 2019).  As to the first option, Regal does not have the right to unilaterally change the Regal ESA's terms, and NCM has not agreed to any such changes.  And the latter two options in particular would breach the exclusivity and non-competition provisions in the Regal ESA; those provisions prohibit Regal from engaging a third party to provide, or itself providing, the services that NCM provides.  NCM is also concerned Regal may breach the confidentiality provision in the Regal ESA; that provision prohibits the sharing of NCM's confidential information, or use of it other than as needed in the ordinary course of business between the parties.

9.      In fact, NCM is concerned that Regal has already breached the Regal ESA in its efforts to pursue the second option – entering into an agreement with an NCM competitor.  In fact, Regal admitted that "the Debtors have engaged in discussions with both internal and external advertising programming providers to better understand the value proposition of an alternative advertising arrangement, and also to ensure that, in the event of rejection of the [Regal] ESA, any new provider – whether in-house or otherwise – will have the capability and knowledge necessary to provide such services with minimal disruption and at superior value."  Rejection Motion ¶ 23. On information and belief, Regal has sent third parties requests for proposals and has engaged in negotiations with Screenvision to provide the services that NCM currently provides under the Regal ESA.  These actions constitute a breach of the non-negotiation provision, which prohibits any such negotiations prior to the last twelve months before the expiration of the Regal ESA, currently set to expire in 2041.  Moreover, to the extent Regal is disclosing confidential

information with these third parties – even indirectly – during the course of their negotiations, such actions constitute a breach of the confidentiality provision.  These provisions are at the heart of the deal between Regal and NCM and would survive the rejection of the Regal ESA.

10.     None of Regal's three paths involve assuming the Regal ESA – and Regal has, by filing the Rejection Motion, disclosed its intent to reject it – but the exclusivity, non-competition, non-negotiation, and confidentiality provisions would survive such rejection under prevailing Supreme Court case law and its progeny, which NCM will establish.

11.     On September 19, 2022, Mooky Greidinger, the CEO of Cineworld Group plc ("Cineworld"), a London-based company that operates Regal in the United States, made a presentation to Regal's lenders where he explained that Regal will pursue one of the three options above in the course of the bankruptcy.  *See* Exhibit B (Lender Presentation) at 61.  Moreover, Regal has now filed the Rejection Motion which, if granted, will constitute a breach of the Regal ESA.

12.     Any breach by Regal of the exclusivity, non-competition, non-negotiation, and/or confidentiality provisions in the Regal ESA would substantially and irreparably harm NCM.  Not only would such a breach destroy NCM's ability to maintain its premium national network and industry-leading position, but given that NCM is already financially suffering from the effects of the pandemic, it would strike at the core of NCM's business.

13.     Thus, Regal must be enjoined from breaching any of these provisions in the Regal ESA.

## **PARTIES**

14.     Plaintiff NCM is a Delaware limited liability company, headquartered in Centennial, Colorado.

15.     Defendant Regal is a Tennessee corporation, headquartered in Knoxville, Tennessee.

16.     On September 7, 2022, Cineworld and 104 affiliated debtors, including Regal, each filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (Houston Division).   On September 9, 2022, Cineworld explained the reasons for the bankruptcy petitions, including the devastating impacts of the COVID-19 pandemic, massive delays in release and production schedules for films, and the growing influence of streaming services, among other business headwinds.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.   NCM consents to entry of final orders or judgment by the bankruptcy court.

18.     Venue is proper pursuant to 28 U.S.C. § 1409.

## FACTS

### *The Formation of a Bespoke Advertising Partnership and the Subsequent 2007 Financing Transaction Under Which NCM Was Formed*

19.     Approximately seventeen years ago, three large theater operators saw an opportunity to utilize an advertising platform deployed in each of their theaters to generate additional revenue that would supplement the revenue being generated by their core businesses. This realization led each of American Multi-Cinema, Inc. ("AMC"), Cinemark Media, Inc. ("Cinemark"), and Regal (together with AMC and Cinemark, the "Founding Members") to form a cost-efficient digital content network with economies of scale.   The thinking of the Founding Members was that (a) the joint venture would compete with television and other national networks with regard to the sale and distribution of advertising, and (b) because of this network's size and

its ability to eliminate redundant in-house advertising costs, the joint venture would be able to charge advertising premium prices, increasing the financial benefits for the Founding Members, each of whom were key participants in that network.

20.     Shortly thereafter, the Founding Members desired to substantially enhance the economics that each of them would receive and, to that end, they decided to undertake a restructuring transaction that was completed in February 2007 (the "2007 Transaction") involving numerous components including, but not limited to, the following:.

- National CineMedia, Inc. ("NCM, Inc.") was formed to be the public company and member manager of NCM, the limited liability company of which each of the Founding Members were members. Regal (together with Regal CineMedia) initially held a 22.6% interest in NCM and currently holds a 23.7% interest in NCM.[3]

- NCM was reorganized by selling approximately 45% of its equity through an initial public offering of NCM, Inc.

- NCM, Inc. used the net proceeds of its IPO to purchase a 44.8% interest in NCM, paying NCM $746.1 million and the Founding Members $78.5 million directly for their units.

- NCM entered into an $805.0 million senior secured credit facility, consisting of a $725.0 million term loan, and an $80.0 million revolving credit facility, receiving $719.8 million of net proceeds. NCM used the funds received from the credit facility and IPO to (i) pay the Founding Members $686.3 million to modify the ESAs, and (ii) pay the Founding Members $769.7 million to redeem the preferred units that were created immediately prior to the IPO and which were held by the Founding Members.

---

[3] In December 2016, AMC entered into a settlement with the Department of Justice in connection with AMC's acquisition of Carmike Cinemas. The settlement required AMC to divest the majority of its equity interests in NCM (subject to certain exceptions) and limited AMC's ability to participate in the management of NCM. In July 2018, AMC sold 100 percent of its remaining interest in NCM to Cinemark and Regal. AMC currently holds a 3.5% interest in NCM following a common unit adjustment in March 2022. The settlement did not impact the ESA between AMC and NCM, and NCM continues to be the exclusive provider of cinema advertising services to AMC, excluding certain excluded theaters for which AMC makes run-out obligation payments pursuant to the terms of the ESA.

- In connection with the 2007 Transaction, the Founding Members received over $1.5 billion.

21.     The Founding Members, including Regal, benefitted handsomely from the 2007 Transaction.  Indeed, NCM distributed approximately $630 million of the proceeds to Regal (as well as similarly large payments to the other Founding Members).

22.     NCM's willingness to agree to these large distributions and the incurrence of this substantial debt, however, was directly tied to the heavily-negotiated terms contained in (a) three, separate **exclusive** ESAs that each of the Founding Members (either directly or through an affiliate) entered into with NCM on February 13, 2007, and (b) several ancillary agreements executed by each of the Founding Members, and each also dated as of February 13, 2007.  The specific agreements that Regal executed with NCM as part of the 2007 Transaction include the Regal ESA.

23.     The terms of the ESAs executed as part of the 2007 Transaction were, by design, very different from the previous (i.e., prior to 2007) ESAs to which the Founding Members were parties.  The new structure was needed to ensure that fair value was given to NCM in exchange for the substantial distributions that each of the Founding Members was receiving as part of the 2007 Transaction.  Specifically, each of the new ESAs extended the term to an unusually long duration (thirty years total) and each contained a guarantee of exclusivity during the entirety of such term, along with a negotiated mechanism to allow NCM to maintain its exclusivity by requiring a Founding Member to pay NCM if newly-acquired theaters were subject to a pre-existing advertising agreement and a broad non-compete.  To align the interests of the Founding Members and NCM, the ESAs also restructured the payments to Founding Members from a revenue share to the "Theatre Access Fees" (as defined in the ESAs), based on attendance and digital screens being used, and provided distributions to the Founding Members and NCM, Inc. on

account of their LLC units in NCM.  Finally, there were a variety of complimentary protections contained within the ancillary agreements.  Suffice it to say, Regal and the other Founding Members always understood that NCM (and its creditors and NCM, Inc.'s public shareholders) relied upon the grant of exclusivity and other terms embodied in the ESAs and the ancillary agreements as part of its decision to incur the significant indebtedness as part of the 2007 Transaction, and make the significant distributions from the proceeds of such indebtedness and the IPO proceeds to the Founding Members (including Regal).

24.     To achieve these objectives, the Founding Members intentionally created NCM as a bespoke partnership and long-term strategic alliance that was (and still is) centered on a series of ESAs that each of the Founding Members (either directly or through and affiliate) entered into with NCM on February 13, 2007, and several ancillary agreements executed by each of the Founding Members.

### The Mechanics of the Regal/NCM Relationship and the Significant Benefits Such Relationship Provides to Regal

25.     Under each ESA executed as part of the 2007 Transaction, including the Regal ESA, NCM serves as the exclusive advertising service provider for the respective United States theaters of each Founding Member (subject to certain mechanics governing a Founding Members' subsequent acquisition of a theater chain that is already subject to a different exclusive agreement). The Founding Member, in turn, receives a monthly theater access fee (the "Theater Access Fee") from NCM which is calculated based upon, among other things, the Founding Member's monthly theater attendance, the number of operating screens and, in the case of Regal and Cinemark since the 2019 amendments to the ESA, the amount of revenue associated with sales of certain premium advertising inventory.  NCM's proprietary digital content network and software allow NCM to

schedule, deliver, and broadcast the advertising and entertainment content without Regal's direct involvement or supervision.

26.     The Regal ESA produces significant revenue streams and equity value for Regal.[4] Since 2007, NCM made total payments to Regal of approximately $1.3 billion, and the average annual payment that NCM has made to Regal from 2015 to 2019 (i.e., in the period prior to the significant downturn caused by the COVID-19 pandemic) was approximately $58 million under the Regal ESA and the ancillary agreements.  NCM's expectation is that annual payments will return to, and ultimately, exceed these levels.  Suffice it to say, although advertising revenue dropped precipitously as a result of the COVID-19 pandemic, the Regal ESA is not a burden on Regal.

### *Relevant Provisions of the Regal ESA*

27.     As noted above, the only reason NCM entered into the 2007 Transaction, which required it to incur substantial debt to pay sizeable dividend and redemption payments, was because Regal's and the other Founding Members' ESAs contained long-duration, favorable exclusivity and non-competition terms (among other terms) that allowed NCM to grow into a profitable market leader in this industry.

28.     More specifically, the Regal ESA contains a provision entitled "Mandatory Participation" making NCM the exclusive provider for, and prohibiting Regal or a third party from providing, advertising services.  Regal ESA § 2.04

---

[4] The two primary recurring payment streams that Regal and the other Founding Members receive from NCM in addition to the payment stream generated under the respective ESAs consist of (i) mandatory member distributions that Regal and the other Founding Members and NCM Inc. receive under an LLC agreement, which are equal to the full amount of available cash generated by NCM unless restricted by NCM's credit agreement and (ii) tax receivable payments that Regal and the other Founding Members receive from NCM on account of certain realized tax benefits under a tax-receivable agreement.

29.     In pertinent part, the Mandatory Participation provision states that, "[d]uring the Term, except as expressly provided in this Agreement, . . . Regal shall subscribe for and [NCM] **shall be the exclusive provider** to the Theatres of the services specifically set forth in the definition of the 'Advertising Services'" (the "Positive Exclusivity Provision"). *Id.* (emphasis added). In addition, it provides that, "[e]xcept as expressly provided in this Agreement, during the Term, **Regal shall neither engage nor permit a third party . . . to provide, or itself provide**, to a Theatre any of the services specifically set forth in the definition of 'Advertising Services' set forth in Exhibit A" (the "Negative Exclusivity Provision," and with the Positive Exclusivity Provision the "Exclusivity Provisions"). *Id.* (emphasis added).

30.     The Regal ESA also contains a provision entitled "Non-Competition," reinforcing the Negative Exclusivity Provision by, in pertinent part, stating:

> In consideration of Regal's participation in [NCM] and in consideration of the mutual covenants and agreements contained in this Agreement, Regal and its Affiliates agree, except as otherwise provided in this Agreement, **not to engage or participate in any business,** hold equity interests, directly or indirectly, in another entity, whether currently existing or hereafter created, or participate in any other joint venture **that competes or would compete with any business that [*NCM*] is authorized to conduct in the Territory pursuant to this Agreement**, whether or not [NCM] is actually conducting such business in a particular portion of the Territory.

*Id.* § 12.07(a) (emphasis added) (the "Non-Competition Provision").

31.     The Regal ESA also contains a provision entitled "Term," expressly limiting the period within the extensive agreement term that Regal can begin negotiations with companies which provide services similar to those NCM provides under the Regal ESA. In pertinent part, the Term provision states:

> The Parties shall, for a period of six (6) months commencing eighteen (18) months before the conclusion of the Initial Term and any Renewal Term, negotiate in good faith terms, if any, on which they may agree to extend the Initial Term or any Renewal Term,

and, if such agreement is reached, this Agreement shall be amended to incorporate such terms. Unless this Agreement is extended by Regal, this Agreement may only be extended by subsequent written agreement of the Parties. ***Prior to*** and during ***such six (6) month period, Regal shall not enter into or conduct any negotiations with any third party with respect to any service that may be competitive with the Advertising Services or any feature thereof.***

*Id.* § 9.01 (emphasis added) (the "<u>Non-Negotiation Provision</u>").

32.    Under the Non-Negotiation Provision, Regal was – and is – not permitted to enter into or conduct any negotiations with any third party with respect to any service that may be competitive with the services NCM is to provide (or any feature thereof) until February 13, 2040.

33.    In addition, the Regal ESA contains confidentiality provisions, providing that for a period of three years after the termination of the Regal ESA, each party shall safeguard one another's confidential information.  Regal also specifically agreed:

> Regal agrees that the Confidential Information of [NCM] shall only be disclosed in secrecy and confidence, and is to be maintained by Regal in secrecy and confidence subject to the terms hereof. ***Regal shall (i) not, directly or indirectly, use the Confidential Information of [NCM], except as necessary in the ordinary course of [NCM]'s business, or disclose the Confidential Information of [NCM] to any third party*** and (ii) inform all of its employees to whom the Confidential Information of [NCM] is entrusted or exposed of the requirements of this Section and of their obligations relating thereto.

*Id.* § 14.01(b) (emphasis added) (the "<u>Confidentiality Provision</u>").

34.    These provisions are not just material terms in the Regal ESA (and the ESAs with the other Founding Members), but they are fundamental to NCM's core business and the relationship between NCM and the Founding Members.  NCM would never have entered into either the Regal ESA or the 2007 Transaction – or paid Regal over $600 million – without the guarantee of exclusivity, non-competition, non-negotiation, and confidentiality.

35.     NCM has also made substantial payments after the 2007 Transaction to Regal under the Regal ESA.  Those payments include a monthly payment for Regal theatres' participation in the advertising services.  The Regal ESA provides that those payments shall be paid by the last day of NCM's fiscal month following the fiscal month in which NCM provided advertising services (the "Initial Payment Deadline").  *See id.* § 2.05(b)(ii).

36.     The Regal ESA contains other provisions central to the parties' interdependent relationship.  The Regal ESA provides for a cure period (the "Cure Period") of at least ninety days for any material default following notice from the other party, and further provides that if the material breach cannot be cured within those ninety days, the Cure Period can be extended as long as is reasonably necessary if the breaching party diligently attempts to cure such breach.  The non-breaching party cannot terminate the Regal ESA until that Cure Period has expired.  *See id.* § 9.02(a).  The parties intentionally made it difficult for the Founding Members to terminate the agreement and provided extensive cure rights to NCM, as the Founding Members as equity owners each had an interest in protecting the scale of the NCM network and its viability.  Thus, the Cure Period was designed to prevent harm not only to Regal but also to the other Founding Members.

### *The Bankruptcy and Regal's Plan to Breach – or Actual Breach of – the Regal ESA*

37.     On September 7, 2022, the Debtors, including Regal, commenced jointly administered cases under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas, which cases are styled as *In re Cineworld Group plc, et al*. and bear Case No. 22-90168 (MI) (the "Chapter 11 Cases").

38.     In light of their long-standing and important relationship, NCM was understandably concerned when the Debtors commenced Chapter 11.  But, given the structure of the parties' joint-venture relationship and the substantial value it provides to Regal, NCM's assumption was that

Regal would not attempt to use the Chapter 11 process to rewrite the Regal ESA. Rather, upon learning of the commencement of the Chapter 11 Cases NCM's mindset was (and remains) one of shared purpose, and NCM stood ready and motivated to ensure that the Debtors (especially the Regal Debtor) achieved their laudable stated objectives of reorganizing their business to maintain a strong presence in the movie theater industry and attract the maximum number of attendees – a goal which, if achieved, NCM strongly believed (and continues to believe) would inure to the mutual benefit of Regal and NCM.

39.    But Regal evidently had other ideas and plans about its commitments to the joint venture generally and the terms of the Regal ESA in particular. As evidenced by the filing of the Rejection Motion among other conduct, Regal seemingly is not content to merely use Chapter 11 as a process for recapitalizing and restructuring its business following the devastating effects of the COVID-19 pandemic, but has now weaponized the Chapter 11 process by opportunistically using it as a sword to resell NCM's exclusive advertising rights (memorialized in the Regal ESA and substantially paid for pursuant to the 2007 Transaction) to a competitor of NCM, or to conduct the advertising business in-house.

40.    Specifically, NCM has learned through credible sources that the Debtors, which include Regal, (a) have already "shopped" the Regal ESA to one or more potential alternative service providers, and (b) are alternatively considering undertaking the advertising function in-house.

41.    More specifically, on September 19, 2022, the Debtors convened a meeting of their lenders in New York City. *See* Exhibit C (Notice of Public Lender Meeting). At that meeting, Mooky Greidinger, the CEO of Cineworld, reportedly made a presentation to prepetition lenders, in which he stated that the Debtors would pursue one of three options regarding screen advertising:

14

> (A)  First, Regal could impose on NCM terms more favorable to Regal.
>
> (B)  Second, Regal could switch to a competitor, Screenvision, or another third party.
>
> (C)  Third, Regal could provide in-house at Regal some or all of the services NCM currently provides under the Regal ESA (as Regal does in the United Kingdom and "rest-of-world" regions).

*See* Exhibit B (Lender Presentation) at 61.

42.    Moreover, upon information and belief, the Debtors have already sent out requests for proposals to competitors of NCM seeking the submission of competing proposals specifying the terms on which they would be willing to provide Regal with similar (although, NCM believes, inferior) services to those currently being provided by NCM.  Indeed, Regal admitted that "the Debtors have engaged in discussions with both internal and external advertising programming providers to better understand the value proposition of an alternative advertising arrangement, and also to ensure that, in the event of rejection of the [Regal] ESA, any new provider – whether in-house or otherwise – will have the capability and knowledge necessary to provide such services with minimal disruption and at superior value."  Rejection Motion ¶ 23.

43.    Upon information and belief, the Debtors have already engaged in discussions with and have received a proposal from an NCM competitor, Screenvision.

44.    With respect to the first option – imposing less favorable terms on NCM – NCM has not agreed to any such modification, and Regal cannot unilaterally amend the Regal ESA. Regal ESA § 15.04 ("This Agreement may be amended only by mutual agreement expressed in writing and signed by both Parties . . . .").  Moreover, Regal has indicated that it will not perform under the Regal ESA unless NCM agrees to "significant changes."  *See* Rejection Motion ¶ 15 ("It

is simply uneconomic for the Debtors to continue under the current [Regal] ESA absent significant changes to key terms of that contract.").

45.     With respect to the second option – switching to Screenvision or another third party for the services NCM currently provides under the Regal ESA – the Regal ESA specifically states that NCM "shall be the exclusive provider to the Theatres of the services" set out in the Regal ESA and that Regal "shall neither engage nor permit a third party . . . to provide . . . to a Theatre any of the services specifically set forth" in the Regal ESA.  Regal ESA § 2.04.  The Regal ESA further states that Regal "shall not enter into or conduct any negotiations with any third party with respect to any service that may be competitive with the" services NCM provides under the Regal ESA "or any feature thereof" until February 13, 2040.  *Id.* § 9.01.  Regal is prohibited from entering into a new contract with Screenvision or another competitor pursuant to the exclusivity and non-competition provision, and it should be enjoined from doing so.

46.     With respect to the third option – bringing in-house to Regal the services NCM currently provides under the Regal ESA – the Regal ESA specifically states that NCM "shall be the exclusive provider to the Theatres of the services," and that Regal shall not "itself provide[] to a Theatre any of the services" NCM provides under the Regal ESA.  *Id.* § 2.04.  In addition, Regal and its affiliates agreed "not to engage or participate in any business, hold equity interests, directly or indirectly, in another entity, whether currently existing or hereafter created, or participate  in any other joint venture that competes or would compete with any business that [NCM] is authorized to conduct in the [United States] pursuant to this [Regal ESA], whether or not [NCM] is actually conducting such business . . . ."  *Id.* § 12.07.  Regal is thus prohibited from itself providing the services covered under the Regal ESA to itself and should be enjoined from doing so.

47.     The second or third option could also involve a breach of the confidentiality provisions in section 14.01 of the Regal ESA, because Regal might need to share – even if indirectly – NCM's confidential information regarding the advertising services provided under the Regal ESA – potentially including pricing, performance, and strategy – with Screenvision or another third party in order to negotiate a new deal, or Regal would need to use this confidential information itself to replace NCM if it decides to handle these services in-house.

48.     Upon information and belief, Regal may have already shared or used confidential information, in breach of the Regal ESA, during its negotiations with third parties like Screenvision over a new deal, or in internal discussions as it has considered providing the services in-house.

49.     Furthermore, Regal has just filed the Rejection Motion, confirming its intention to pursue one of these options in breach of the Regal ESA; and if the Rejection Motion is granted, that will likewise constitute a breach.

50.     In other words, despite having received approximately $630 million from the creditors and other stakeholders of NCM in exchange for a long-term, exclusive agreement, Regal is now, in a complete about-face, seeking to sell the very same exclusive rights again – this time under the cover of Chapter 11 and Section 365 of the Bankruptcy Code.

51.     Such tactics go beyond the rehabilitative purpose of the Chapter 11 process and are not only discouraged by courts but also clearly violate the letter and spirit of the Regal ESA.  All three of Regal's proposed options would breach the Regal ESA, any negotiations with Screenvision or submissions of requests for proposals to other third parties would be a current breach, and any sharing or use of NCM's confidential information for a purpose other than what is permitted in the Regal ESA would also be a current breach.  In this way, the Debtors seek to

eviscerate protections that NCM not only bargained for (in good faith and at arms-length) but already paid substantially for through the proceeds of the 2007 Transaction.

52.     To make matters worse, Regal has threatened that if NCM pays the Theater Access Fees or other payments even once after the Initial Payment Deadline, but within the Cure Period, it will "turn off" the screens, *i.e.*, terminate its performance, despite the Regal ESA explicitly prohibiting termination during the Cure Period.  Regal thus may seek to leverage NCM's right to use the contractually-agreed upon Cure Period to excuse its obligations under the Regal ESA.

### *Harm to NCM*

53.     Regal's actual and proposed breaches of the Regal ESA – notably, an agreement that has a term running through February 13, 2041[5] – would clearly not just lead to lead to sizable damages but would strike at the heart of NCM's business model and relationship with all of the Founding Members.  Regal screens represent approximately one-third of all screens in NCM's network, and the associated attendance of Regal's movie customers is a key revenue driver and an integral part of NCM's ability to provide advertisers a national platform at appropriate rates. Accordingly, the disappearance of that revenue and attendance has the potential to lead to significant harm to NCM, beyond merely the loss of revenues from Regal itself.

54.     Specifically, although its analysis is still ongoing, NCM currently estimates that Regal's proposed breach of the Regal ESA, if permitted, would result in a damages claim in excess of one billion dollars.  And, importantly, such claim (a) would not be subject to any statutory cap or known theory of subordination, (b) would be a claim that could be asserted directly against the Debtors' operating company, and (c) would be structurally senior to the claims of both Cineplex

---

[5] The Regal ESA originally had a thirty-year term (through February 13, 2037).  A 2019 amendment by Regal to the Regal ESA extended the term through February 13, 2041.  Thus, there are approximately 19 years remaining on the Regal ESA.

(a large judgment creditor) and secured creditors who assert claims against the publicly-traded Debtor (*i.e.*, Cineworld Group, plc).  In addition, NCM would lose market share and a portion of the broad nationwide network that gives it the ability to charge a premium on advertising rates, which could impair its position as the industry leader.  Not only would NCM's entire business be at risk, but Regal's breach of the Regal ESA would have a cascading harmful effect on the other Founding Members as well.  In light of the foregoing, ***NCM may have more at stake than any of the individual Debtors' other creditors*** and monetary damages would not be enough remedy the harm.

## COUNT I:
### (Breach of Contract)

55.     Plaintiff NCM repeats and realleges allegations 1 through 54 above as if fully set forth herein.

56.     As described above, Regal has breached the Regal ESA, specifically (and without limitation) the Non-Negotiation and Confidentiality Provisions.

57.     Regal has admitted that "the Debtors have engaged in discussions with both internal and external advertising programming providers to better understand the value proposition of an alternative advertising arrangement, and also to ensure that, in the event of rejection of the [Regal] ESA, any new provider – whether in-house or otherwise – will have the capability and knowledge necessary to provide such services with minimal disruption and at superior value."  Rejection Motion ¶ 23.  On information and belief, Regal has sent or received third party requests for proposals and/or has engaged in negotiations with Screenvision to provide the services that NCM currently provides under the Regal ESA.

58.     Regal may have disclosed confidential NCM information during those discussions with third parties and/or Screenvision as well.  Regal may also be using NCM's confidential

information outside of the bounds of the Regal ESA as it considers providing the advertising in-house in its United States theaters.

## COUNT II:
### (Anticipatory Breach)

59. Plaintiff NCM repeats and realleges allegations 1 through 58 above as if fully set forth herein.

60. As described above, Regal has anticipatorily breached the Regal ESA, specifically (and without limitation) the Exclusivity and Non-Competition Provisions of the Regal ESA.

61. Regal stated at the September 19, 2022 meeting with its lenders that it will breach the Regal ESA in one of the three ways described above:

    (A)    First, Regal could impose on NCM terms more favorable to Regal.

    (B)    Second, Regal could switch to a competitor, Screenvision, or another third party.

    (C)    Third, Regal could provide in-house at Regal some or all of the services NCM currently provides under the Regal ESA (as Regal does in the United Kingdom and "rest-of-world" regions).

*See* Exhibit B (Lender Presentation) at 61.

62. As discussed above, any of the above actions would constitute a breach, and the second and third options, in particular, would breach the Exclusivity and Non-Competition Provisions of the Regal ESA, which prohibit any third party from providing the advertising services that NCM provides to Regal, or Regal providing the services itself. Regal has thus stated that it will not perform unless terms different from the Regal ESA are met, *see* Rejection Motion ¶ 15, and has refused to abide by its contractual obligations under the Exclusivity and Non-Competition Provisions.

## COUNT III:
### (Declaratory Judgment Regarding the Exclusivity, Non-Competition, Non-Negotiation, and Confidentiality Provisions)

63.     Plaintiff NCM repeats and realleges allegations 1 through 62 above as if fully set forth herein.

64.     As described above, Regal intends to breach the Regal ESA, specifically (and without limitation), the Exclusivity, Non-Competition, Non-Negotiation, and Confidentiality Provisions.

65.     In fact, upon information and belief, Regal may have already violated at least several of these provisions.  Regal has admitted that "the Debtors have engaged in discussions with both internal and external advertising programming providers to better understand the value proposition of an alternative advertising arrangement, and also to ensure that, in the event of rejection of the [Regal] ESA, any new provider – whether in-house or otherwise – will have the capability and knowledge necessary to provide such services with minimal disruption and at superior value."  Rejection Motion ¶ 23.  On information and belief, Regal has sent third parties requests for proposals and has engaged in negotiations with Screenvision to provide the services that NCM currently provides under the Regal ESA, which violates the Non-Negotiation clause.  Moreover, Regal may have disclosed confidential NCM information to inform the bounds of those discussions, or it may have improperly used NCM's confidential information itself as it has considered providing the services in-house, in violation of the Confidentiality Provisions.

66.     Regal has also attempted to renegotiate the terms of the Regal ESA with NCM and has threatened that, if those negotiations failed, it would either contract with a third party or bring in-house any of the services specifically set forth in the Regal ESA (or similar services).

67.     NCM seeks a declaration that such conduct constitutes a material breach of the Exclusivity, Non-Competition, Non-Negotiation, and Confidentiality Provisions of the Regal

ESA.  For the sake of clarity, NCM seeks a declaration that the following acts by Regal (and any of the other Debtors, and any of their affiliates, parents, subsidiaries, agents, and employees) materially breach the Regal ESA:

1.  bringing in-house any of the services specifically set forth in the Regal ESA (or similar services);

2.  engaging or permitting a third party to provide any of the services specifically set forth in the Regal ESA (or similar services);

3.  negotiating with any third party to provide services covered by the contract; and/or

4.  sharing confidential information with third parties or using such confidential information to itself develop services that NCM is authorized to conduct.

### COUNT IV:
### (Declaratory Judgment Regarding the Cure Period)

68.     Plaintiff NCM repeats and realleges allegations 1 through 67 above as if fully set forth herein.

69.     As described above, Regal has threatened to terminate the Regal ESA if NCM does not pay any Theater Access Fee or other payment by the Initial Payment Deadline, and instead uses its contractually agreed-upon right to a 90-day Cure Period to make such payment.

70.      NCM seeks a declaration that any payments made by Regal to NCM under the Regal ESA prior to or during the Cure Period will not constitute a default excusing Regal's performance or otherwise triggering a right to terminate the Regal ESA.

### COUNT V:
### (Injunctive Relief Pre-Rejection)

71.     Plaintiff NCM repeats and realleges allegations 1 through 70 above as if fully set forth herein.

72.     As described above, Regal intends to breach the Regal ESA without waiting to learn whether its Rejection Motion is granted, specifically (and without limitation), the Exclusivity, Non-Competition, Non-Negotiation, and Confidentiality Provisions.  In fact, upon information and belief, Regal may have already violated at least several of these provisions.

73.     NCM seeks an injunction, governing the period before the Rejection Motion is decided, enjoining Regal, the other Debtors, and all of their affiliates, parents, subsidiaries, agents, and employees from violating, continuing to violate, or violating in the future the Negative Exclusivity, Non-Competition, Non-Negotiation, and Confidentiality Provisions of the Regal ESA.  For the sake of clarity, Regal, the other Debtors, and all of their affiliates, parents, subsidiaries, agents, and employees are enjoined from

1.      bringing in-house any of the services specifically set forth in the Regal ESA (or similar services);

2.      engaging or permitting a third party to provide any of the services specifically set forth in the Regal ESA (or similar services);

3.      negotiating with any third party to provide services covered by the contract; and/or

4.      sharing confidential information with third parties or using such confidential information to itself develop services that NCM is authorized to conduct.

## COUNT VI:
### (Injunctive Relief Post-Rejection)

74.     Plaintiff NCM repeats and realleges allegations 1 through 73 above as if fully set forth herein.

75.     As described above, if the Rejection Motion is granted, Regal intends to further breach the Regal ESA, specifically (and without limitation), the Negative Exclusivity, Non-Competition, Non-Negotiation, and Confidentiality Provisions.  In fact, upon information and belief, Regal may have already violated at least several of these provisions.

76.     NCM seeks a permanent injunction, after the Regal ESA is rejected, enjoining Regal, the other Debtors, and all of their affiliates, parents, subsidiaries, agents, and employees from violating, continuing to violate, or violating in the future the Negative Exclusivity, Non-Competition, Non-Negotiation, and Confidentiality Provisions of the Regal ESA.  For the sake of clarity, Regal, the other Debtors, and all of their affiliates, parents, subsidiaries, agents, and employees are enjoined from

1.     bringing in-house any of the services specifically set forth in the Regal ESA (or similar services);

2.     engaging or permitting a third party to provide any of the services specifically set forth in the Regal ESA (or similar services);

3.     negotiating with any third party to provide services covered by the contract; and/or

4.     sharing confidential information with third parties or using such confidential information to itself develop services that NCM is authorized to conduct.

**WHEREFORE**, Plaintiff NCM demands judgment against Defendant, as follows:

(A)     judgment declaring that Regal, the other Debtors, and all of their affiliates, parents, subsidiaries, agents, and employees may not breach the Regal ESA by:

1.     bringing in-house any of the services specifically set forth in the Regal ESA (or similar services);

2.     engaging or permitting a third party to provide any of the services specifically set forth in the Regal ESA (or similar services);

3.     negotiating with any third party to provide services covered by the contract; and/or

4.     sharing confidential information with third parties or using such confidential information to itself develop services that NCM is authorized to conduct.

(B)     judgment permanently enjoining Regal, the other Debtors, and all of their affiliates, parents, subsidiaries, agents, and employees from breaching (and/or continuing to breach) the Regal ESA by:

1. bringing in-house any of the services specifically set forth in the Regal ESA (or similar services);

2. engaging or permitting a third party to provide any of the services specifically set forth in the Regal ESA (or similar services);

3. negotiating with any third party to provide services covered by the contract; and/or

4. sharing confidential information with third parties or using such confidential information to itself develop services that NCM is authorized to conduct; and

(C) such other and further relief as the Court deems just and proper.

Date:  October 21, 2022                    Respectfully submitted


**PORTER HEDGES LLP**

*/s/ Eric M. English*
John F. Higgins (TX 09597500)
Eric M. English (TX 24062714)
1000 Main Street, 36th Floor
Houston, Texas 77002
 Phone: (713) 226-6000
Fax: (713) 228-1331
Email: jhiggins@porterhedges.com
eenglish@porterhedges.com

- and –

George A. Davis*
Suzzanne S. Uhland*
Christopher Harris
Adam S. Ravin*
Elizabeth R. Marks*
Tianjiao "TJ" Li*
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: george.davis@lw.com
        suzzanne.uhland@lw.com
        christopher.harris@lw.com
        adam.ravin@lw.com
        betsy.marks@lw.com
        tj.li@lw.com

*Admitted Pro Hac Vice*

**Counsel to National CineMedia, LLC and
National CineMedia, Inc.**

**CERTIFICATE OF ACCURACY**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Suzzanne S. Uhland*
Suzzanne S. Uhland

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 21, 2022, a true and correct copy of the foregoing document was served via email through the Bankruptcy Court's Electronic Case Filing System on the parties that have consented to such service.

*/s/ Eric M. English*
Eric M. English