**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| CINEWORLD GROUP PLC, *et al.*,[1] | Case No. 22-90168 (MI) |
| | (Jointly Administered) |
| National CineMedia, LLC, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 22-03307 |
| Regal Cinemas, Inc., | |
| Defendant. | |

**<u>REGAL'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

---

[1]  A complete list of each of the above captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at <u>https://cases.ra.kroll.com/cineworld</u>.  The location of the Debtor Cineworld Group plc's principal place of business and the Debtors' service address in these chapter 11 cases is: 8th Floor Vantage London, Great West Road, Brentford, England, TW8 9AG, United Kingdom.

## <u>TABLE OF CONTENTS</u>

I.     NCM MISREADS *MISSION PRODUCT*, IGNORES THE CLEAR CONSEQUENCES OF THE EXCLUSIVITY PROVISION, AND APPLIES AN INCORRECT LEGAL STANDARD ...................................................................... 2

   A.   Regal Is Entitled To Judgment As A Matter Of Law Because *Mission Product* Held That Debtors May Repudiate Further Performance Of Contractual Obligations After Rejection .................................................. 4

   B.   The ESA Provisions Require Regal's Performance.................................. 5

        1.   NCM Cannot Ignore The Entirety Of The Exclusivity Provision To Create A "Negative" Exclusivity Right ...................................... 5

        2.   The ESA Provisions Do Not Require "Mere Inaction" ........................... 7

        3.   NCM's Attempts To Distinguish "Negative" From "Positive" Or "Affirmative" Performance Obligations Is Not Supported By *Mission Product* .................................................................... 8

        4.   The Case Law Does Not Support NCM's Argument ............................. 10

   C.   NCM Attempts To Manufacture Irrelevant (And Undisputed) "Fact Issues"....... 13

II.    NCM'S AFFIRMATIVE DEFENSES DO NOT PRECLUDE SUMMARY JUDGMENT.................................................................................... 14

III.   NCM'S REMAINING ARGUMENTS DO NOT PRECLUDE SUMMARY JUDGMENT IN REGAL'S FAVOR .................................................... 15

   A.   Any Alleged Economic Burden To NCM From Rejection Is Irrelevant.............. 16

   B.   NCM's Only Remedy Arising From Regal's Breach Of The ESA Is A Dischargeable Claim................................................................ 16

   C.   NCM Ignores Regal's Fiduciary Duties To Its Estate ........................... 20

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Gulfport Energy Corp. v. FERC*,
    41 F.4th 667 (5th Cir. 2022) ...............................................................19

*In re Big Rivers Elec. Corp.*,
    233 B.R. 739 (W.D. Ky. 1998) .........................................................21, 22

*In re Chestnut Ridge Plaza Assocs., L.P.*,
    156 B.R. 477 (Bankr. W.D. Pa. 1993) ..............................................10, 11

*In re EllDan Corp.*,
    2023 WL 175195 (Bankr. D. Minn. Jan. 12, 2023) ...........................12, 13

*In re Extraction Oil & Gas*,
    622 B.R. 608 (Bankr. D. Del. 2020) ........................................................12

*In re Franklin*,
    2022 WL 903735 (Bankr. E.D. Mich. Mar. 28, 2022) ..............................7

*In re IT Grp., Inc.*,
    350 B.R. 166 (Bankr. D. Del. 2006) ........................................................21

*In re Lager*,
    2022 WL 3330421 (Bankr. N.D. Tex. Aug. 11, 2022) .....................12, 13

*In re Mitchell*,
    249 B.R. 55 (Bankr. S.D.N.Y. 2000) ......................................................21

*In re Nine Point Energy Holdings, Inc.*,
    633 B.R. 124 (D. Del. 2021) ........................................................... *passim*

*In re Orama Hosp. Grp.*,
    601 B.R. 340 (Bankr. D.N.J. 2019) ...............................................4, 9, 12

*In re Roberts*,
    607 B.R. 635 (Bankr. N.D. Ill. 2019) .....................................................19

*In re Rosenberg*,
    495 B.R. 196 (Bankr. E.D.N.Y. 2010) ....................................................21

*In re Southland Royalty Co.*,
    623 B.R. 64 (Bankr. D. Del. 2020) .......................................................8, 12

*In re U.S. Pipe & Foundry Co.*,
    32 F.4th 1324 (11th Cir. 2022), *cert. pet. filed*, No. 22-115 (Aug. 1, 2022) ..........................19

ii

*In re Ultra Petroleum Corp.*,
621 B.R. 188 (Bankr. S.D. Tex. 2020), *aff'd,* 28 F.4th 629 (5th Cir. 2022)...........................16

*Matter of Davis*,
3 F.3d 113 (5th Cir. 1993) ..............................................................................................18, 19

*Mission Product Holdings, Inc. v. Tempnology, LLC*,
139 S. Ct. 1652 (2019)....................................................................................... *passim*

*NLRB v. Bildisco & Bildisco*,
465 U.S. 513 (1984).........................................................................................................4, 22

*Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics
Corp. v. Chinery*,
330 F.3d 548 (3d Cir. 2003)....................................................................................................22

*Sunbeam Prods., Inc. v. Chi. Am. Mfg., LLC*,
686 F.3d 372 (7th Cir. 2012) ...................................................................................................19

*Symbiont.io, Inc. v. Ipreo Holdings, LLC*,
2021 WL 3575709 (Del. Ch. Aug. 13, 2021) ........................................................................18

*XRI Inv. Holdings LLC v. Holifield*,
283 A.3d 581 (Del. Ch. 2022)..................................................................................................20

**Statutes**

11 U.S.C. § 101(5)(B) ..........................................................................................................17, 18, 19

11 U.S.C. § 365....................................................................................................... *passim*

Pub. L. 103-394 § 205(a) (Oct. 22, 1994) ....................................................................................11

## PRELIMINARY STATEMENT[2]

1.       As the Supreme Court has clearly and repeatedly stated, "[t]hrough rejection, the debtor can escape all of its future contract obligations, without having to pay much in return." *Mission Product Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1665 (2019).  The import of this principle here is clear: upon Regal's rejection of the ESA, it may repudiate the contractual obligations that prohibit Regal from negotiating with alternative advertising providers, providing those advertising services itself, or utilizing a third party to provide those services.

2.       NCM's response is telling.  *First*, NCM relies on the legal fiction that the ESA Provisions are not Regal's performance obligations.  To that end, NCM attempts to distinguish between so-called "negative" and "positive" exclusivity provisions in the ESA.  But the ESA contains only one Exclusivity Provision, which, read as a whole, clearly obligates Regal to obtain advertising services from NCM and only NCM.  Moreover, even if the Exclusivity Provision could be subdivided into "positive" and "negative" components (and it cannot), the "negative" exclusivity provision still imposes a performance obligation on Regal that is unenforceable post-rejection.  Most fundamentally, NCM applies the wrong legal standard.  NCM contends that only "affirmative" obligations are unenforceable post-rejection, and because the negative exclusivity and non-compete provisions only require Regal to *refrain* from acting, they should remain enforceable after rejection.   Such an approach is inconsistent with the holding and reasoning of *Mission Product*, which holds that upon rejection, a debtor "repudiat[es] . . . any further performance of its duties"—regardless of whether that performance could be characterized as

---

[2]  All undefined capitalized terms shall have the meanings accorded to them in Regal's Motion for Summary Judgment (ECF No. 12) (the "Motion" or "Mot.").  Unless otherwise noted, all emphasis in this brief is added.

affirmative or negative.  139 S. Ct. at 1658.  That is all Regal is attempting to do with respect to the ESA by its Motion.

3.      *Second*, NCM concocts manufactured procedural flaws in an attempt to stave off summary judgment.  Specifically, NCM argues that material "factual disputes" exist and that Regal's failure to address NCM's affirmative defenses to Regal's counterclaim precludes summary judgment entirely.  But the "factual disputes" concern issues that either NCM admits have no bearing on the Motion or which it has already conceded.  NCM's reliance on its boilerplate affirmative defenses to Regal's counterclaim fares no better as Regal moved for summary judgment not only on its counterclaim, but also on NCM's claims for injunctive relief.  Moreover, the basis for NCM's affirmative defenses can only be the very same negotiations with other potential advertising services providers that NCM allowed to continue after the Court found that NCM had violated the automatic stay.  Indeed, NCM expressly states that it is not seeking to enforce the No-Negotiate Provision, and Regal's Motion is uncontested with respect to that obligation.

4.      For these reasons, and as further explained below, Regal is entitled to judgment as a matter of law on its Motion.  Specifically, as a matter of law, (a) the Exclusivity, Non-Compete, and No-Negotiate Provisions are unenforceable after rejection of the ESA and (b) NCM is not entitled to injunctive relief requiring Regal to perform pursuant to those provisions.

## REPLY

## I.      NCM MISREADS *MISSION PRODUCT*, IGNORES THE CLEAR CONSEQUENCES OF THE EXCLUSIVITY PROVISION, AND APPLIES AN INCORRECT LEGAL STANDARD

5.      As Regal has repeatedly stated, its contractual obligations under the ESA Provisions would not be enforceable post-rejection because rejection allows a debtor to "escape all of its future contract obligations."  *Mission Product*, 139 S. Ct. at 1665.  Indeed, this

fundamental legal principle cannot be in dispute.  Because NCM is insisting that Regal continue to perform under the ESA, that principle should resolve the inquiry in Regal's favor.

6.      To avoid that outcome, NCM first mischaracterizes Regal's position.  NCM incorrectly claims that Regal is seeking summary judgment based on the theory that "rejection extinguishes counterparty rights whenever non-compliance with its obligations is economically more attractive to a debtor than 'performing' under them."  (NCM Opp'n ¶ 52.)  That is not Regal's argument.  (*See, e.g.*, Mot. ¶ 38 ("Although the Supreme Court held in *Mission Product* that certain contract rights may continue after rejection, it also made clear that provisions requiring a debtor's continued performance—like the ESA Provisions at issue here—would not remain enforceable.").)

7.      Next, NCM erroneously claims that portions of the ESA Provisions, when read in isolation, "do *not* obligate Regal to continue subscribing for advertising services from NCM." (NCM Opp'n ¶ 1 (emphasis in original).)  In NCM's view, these contract provisions create "rights" that obligate Regal to merely "refrain" from acting after rejection.  That ignores the text of the Exclusivity Provision—labeled "Mandatory Participation"—which requires Regal to "subscribe for" NCM's advertising services.  Requiring that Regal "refrain" from obtaining third-party advertising services necessarily means that Regal must continue to perform its ongoing contractual obligations to NCM.  Under *Mission Product*, however, NCM cannot require such continued performance after rejection.

8.      Finally, NCM manufactures a legal standard whereby, even after rejection, a debtor must still perform any contractual obligation that can be characterized as "negative" instead of "affirmative."  But the notion that requiring a debtor's post-rejection "affirmative" performance is legally different from its post-rejection "negative" performance is a made-up concept that appears nowhere in *Mission Product*.  NCM's arguments to the contrary should be rejected.

A. **Regal Is Entitled To Judgment As A Matter Of Law Because *Mission Product* Held That Debtors May Repudiate Further Performance Of Contractual Obligations After Rejection**

9.     Supreme Court precedent and the Bankruptcy Code provide that a debtor cannot be forced to perform its contractual obligations after rejection.  In *Mission Product*, the Supreme Court held that a contract rejection in bankruptcy functions as a breach, after which a debtor may "repudiat[e] . . . *any* further performance of its duties." 139 S. Ct. at 1658.  This holding is revisited and reiterated several times throughout the opinion.  *See id.* at 1659 ("[Rejection] meant . . . *[the debtor] could stop performing under the contract*."); *id.* at 1662 ("***The debtor can stop performing its remaining obligations under the agreement***."); *id.* at 1665 ("***Through rejection, the debtor can escape all of its future contract obligations***, without having to pay much of anything in return.").

10.     This holding is consistent with the purpose of rejection, which is "to release the debtor's estate from burdensome obligations that can impede a successful reorganization." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984).  Otherwise, requiring performance would reimpose these prepetition obligations on the estate and "fundamentally impair a debtor's ability to reorganize." *In re Nine Point Energy Holdings, Inc.*, 633 B.R. 124, 136 (D. Del. 2021); *see also In re Orama Hosp. Grp.*, 601 B.R. 340, 349 (Bankr. D.N.J. 2019) ("It seems incongruous that the Bankruptcy Code would grant a debtor the right to reject (and thus breach) a contract while preserving the right of the counter-party to compel performance of the same contract.").

11.     NCM fixates on *Mission Product*'s statement that "[a] rejection breaches a contract but does not rescind it. And that means all the rights that would ordinarily survive a contract breach, including those conveyed here, remain in place." (NCM Opp'n ¶ 4.)  NCM simply ignores *Mission Product*'s holding that any and all of a debtor's performance obligations are unenforceable post-rejection.  The ESA Provisions are precisely such obligations.

### B.      The ESA Provisions Require Regal's Performance

12.      NCM proffers several meritless arguments to suggest that the ESA Provisions—what NCM calls the "Negative Covenants"—do not require performance.  NCM's arguments are inconsistent with the plain terms of the ESA and the case law.

### *1.      NCM Cannot Ignore The Entirety Of The Exclusivity Provision To Create A "Negative" Exclusivity Right*

13.      The central provision at issue in this case is the ESA's Exclusivity Provision. NCM erroneously argues that the Exclusivity Provision is composed of two separate terms—one that requires performance (what NCM calls the "Positive Exclusivity Provision"), and one that does not (what NCM calls the "Negative Exclusivity Provision").  NCM contends that the "Positive Exclusivity Provision"—which requires Regal to "subscribe" for NCM's advertising services—can be ignored because it does not intend to enforce it.  (NCM Opp'n ¶¶ 20–22 & n.7 (citing ESA § 2.04); *id.* ¶ 98.)  NCM argues that the Negative Exclusivity Provision, on its own, should remain enforceable after rejection.  (*Id.*)

14.      Going further, NCM even claims that Regal "misleadingly defines the 'Exclusivity Provision' on which it is moving for judgment to encompass the separate Positive Exclusivity Provision in the Regal ESA."  (*Id.* ¶ 38.)  But there is only one exclusivity provision in the ESA, as NCM acknowledged in its Complaint.  (*See* Complaint (ECF No. 1) ¶¶ 28–29.) That provision, entitled "**Mandatory Participation**," states:

> During the Term, except as expressly provided in this Agreement . . . ***Regal shall subscribe for and LLC shall be the exclusive provider to the Theatres of the services specifically set forth in the definition of the "Advertising Services."*** Except as expressly provided in the Agreement, during the Term, ***Regal shall neither engage nor permit a third party (excluding third party designees of LLC as provided hereunder) to provide, or itself provide, to any Theatre any of the services specifically set forth in the definition of "Advertising Services"*** set forth in Exhibit A. . . ."

(Mot. Ex. 1, ESA § 2.04.)

15.     The Exclusivity Provision plainly requires Regal to "subscribe" exclusively to NCM for advertising services and prevents Regal from engaging a third party to enforce that exclusive subscription obligation.  Nothing in the ESA indicates that the parties intended the second sentence of the Exclusivity Provision to be read (or enforced) in isolation.

16.     Since *Mission Product*, courts interpreting similar provisions have found that "negative" exclusivity terms necessarily involve "positive" performance.  In *Nine Point*, the exclusivity provision, as here, required the debtor to accept the non-debtor's services (specifically, the delivery of oil and gas) and, to effectuate that obligation, also prohibited the debtor from contracting with others for the same service.  633 B.R. at 134.  NCM contends that the Exclusivity Provision "look[s] nothing like" the contract terms in *Nine Point* and that—in NCM's framing— *Nine Point* contained only an "affirmative exclusivity clause," not a "negative exclusivity clause." (NCM Opp'n ¶¶ 98, 100.)  Not so.  Both the ESA and the contractual provisions in *Nine Point* required the debtor to accept the non-debtor's services *and* not accept any competing services. NCM ignores that the disputed provisions in *Nine Point* required the debtors "not to deliver any [specified gas] . . . to any other gas gatherer, gas purchaser, gas marketer or other Person"— precisely what NCM would call a "negative" exclusivity provision.  633 B.R. at 134.

17.     Nonetheless, the *Nine Point* court correctly held that the non-debtor "has no right to use the [exclusivity provisions] <u>except</u> in its performance of the contracts, which can only occur after the Debtors perform."  *Id.* at 136 (emphasis in original).  Notably, NCM calls *Nine Point* a "faithful application of *Mission [Product]*."  (NCM Opp'n ¶ 7; *see id.* ¶ 93.)  The same is true here.  NCM has no right to use the ESA Provisions "except in its performance of the contracts." *Nine Point*, 633 B.R. at 136.

18.     NCM's approach would frustrate the purpose of rejection—and the plain language of *Mission Product*—as any non-debtor could claim a contractual right in any exclusivity obligation and demand a debtor's post-rejection performance of that obligation.  *See, e.g.*, *id.* (noting that under the non-debtor's argument, "any contract counterparty [could] inoculate itself from the effects of rejection by including an exclusivity provision in its contract" and "fundamentally impair" the debtor's ability to reorganize); *see also In re Franklin*, 2022 WL 903735, at *4 (Bankr. E.D. Mich. Mar. 28, 2022) (acknowledging that it would "accomplish no meaningful end" to allow a non-debtor to force the debtor's inaction when the non-debtor did not intend to exercise any contract rights itself).

19.     Simply put, the ESA gives NCM a right to provide advertising services and, to effectuate that right, imposes exclusivity obligations on Regal.  Just as in *Nine Point*, the contractual obligations are inextricably linked: Regal's obligation to adhere to the Exclusivity Provision does not exist independent of NCM's provision of advertising services in Regal's theaters.  Because the ESA Provisions require Regal's performance, they cannot remain in force after rejection.

### 2.     *The ESA Provisions Do Not Require "Mere Inaction"*

20.     Even if the Exclusivity Provision could be divided into "affirmative" and "negative" components, NCM cannot avoid the inescapable conclusion that the so-called "Negative Exclusivity Provision" requires Regal's continued performance.  NCM relies on semantics, claiming that "NCM's rights under the Negative Covenants are not contingent on any ongoing 'performance' by Regal."  (NCM Opp'n ¶ 59.)  To the contrary, in *Nine Point*, the court rightly rejected the argument that exclusivity provisions did not require the debtor's performance, because "an 'exclusivity' provision requires future performance by both parties" and "[w]hile it is possible to view an exclusivity provision as something that belongs to [the non-debtor], it only has

meaning if it is an obligation of [the debtor]. In other words, the exclusivity provision is an obligation that binds [the debtor] in a certain way." 633 B.R. at 136 n.7; *see also, e.g.*, *In re Southland Royalty Co.*, 623 B.R. 64, 89 (Bankr. D. Del. 2020) ("If [the debtor] rejects the [] Agreement, it repudiates any further performance of its remaining duties thereunder, including its exclusivity promise."). *Nine Point* specifically held that "negative" covenants were unenforceable post-rejection because they require performance, not mere inaction. NCM's arguments about the ESA Provisions should be rejected for the same reason.

> **3.** **NCM's Attempts To Distinguish "Negative" From "Positive" Or "Affirmative" Performance Obligations Is Not Supported By** Mission Product

21. Critically, even if the ESA Provisions were characterized as purely "negative" obligations, *Mission Product* does not support NCM's position that a contractual obligation's post-rejection enforceability turns on whether it is characterized as "positive" or "affirmative" versus "negative." To the contrary, *Mission Product* instructs that a debtor can "repudiat[e] *any* further performance of its duties" and "escape *all* of its future contract obligations." 139 S. Ct. at 1658, 1665. The Supreme Court did not say that a debtor can repudiate the performance of and escape only "affirmative" or "positive" obligations after rejection. There is also no basis for such a distinction in the Bankruptcy Code. Section 365(a) of the Bankruptcy Code provides for the rejection of "any" executory contract, and section 365(g) provides that such rejection is treated as a "breach" of such contracts, without any distinction for provisions that a non-debtor characterizes as "affirmative" versus "negative" obligations.

22. The issue, therefore, is not whether a debtor's obligation is "negative" or "positive," but whether a non-debtor has a previously conveyed *right to take certain actions under the contract independent of the debtor's future performance*. The distinction between what *Mission Product* endorses and what NCM is attempting to do here is best illustrated by the facts

of *Mission Product* and its "photocopier" example.  In *Mission Product*, the Supreme Court allowed the non-debtor to continue making products with the debtor's trademark post-rejection and also noted that a hypothetical non-debtor leasing a photocopier could choose to continue using the machine post-rejection.  139 S. Ct. at 1662–63.  Thus, while the non-debtors could "continue to do whatever the [contract] authorizes"—*i.e.*, retain their rights to use a licensed trademark or a leased photocopier—no further performance by the debtor was required.  *Id.*

23.     As subsequent courts have explained, *Mission Product* establishes that a non-debtor can retain its previously conveyed rights under a contract to *use* debtor property, so long as those rights do not impose any performance obligations on the debtor.  *E.g.*, *Nine Point*, 633 B.R. at 135 ("*Mission Product* stands for the proposition that rejection cannot restrain a non-debtor's use of its contractual rights that do not depend on the debtor's future performance; it does not allow a non-debtor to force the debtor to perform under a contract after its rejection."); *In re Orama*, 601 B.R. at 349 ("[*Mission Product*] made it clear that a counter-party to a rejected executory contract could retain interests that it had already received (like the right to use a trademark).  The Supreme Court did not say that the debtor had to continue to perform its obligations under a rejected executory contract.").

24.     Here, NCM does not want to *do* anything that it was permitted to do under the pre-rejection ESA, *other than make Regal perform its own contractual obligations*.  NCM does not wish to use a trademark, a photocopier, or any kind of previously conveyed right that could be analogized to the rights discussed in *Mission Product*.  In other words, its "right" under the ESA is simply the right to demand Regal's future performance (whether of supposed "affirmative" or "negative" obligations). But *Mission Product* does not endorse efforts to enforce a debtor's obligations, however framed.  NCM tries to reframe Regal's performance obligations under the

ESA as its own contract "right," but it is merely relabeling a right to demand Regal's performance. (*See* NCM Opp'n ¶ 58.)   A non-debtor's pre-rejection right to a debtor's performance of its contractual obligations cannot simply be reframed as "contractual rights" that survive rejection under *Mission Product*.   To do so would impermissibly nullify *Mission Product*'s repeated statements that upon rejection, any performance obligations of a debtor are eliminated.[3]

### 4.        *The Case Law Does Not Support NCM's Argument*

25.        NCM also incorrectly claims that the case law supports its position that the ESA Provisions remain enforceable after rejection.   NCM relies almost entirely on non-binding pre-*Mission Product* cases that are distinguishable for the reasons stated in the Motion.   (NCM Opp'n ¶¶ 58, 82–84; Mot. ¶ 58.)   NCM cites an additional pre-*Mission Product* case, *In re Chestnut Ridge Plaza Associates, L.P.*, 156 B.R. 477 (Bankr. W.D. Pa. 1993), which is also readily distinguishable. That case concerned a real property lease governed by section 365(h) of the Bankruptcy Code— which at the time specifically allowed a lessee under a rejected lease to "remain in possession of [a] leasehold"—and considered whether certain covenants were part of the "leasehold" under Pennsylvania law.  156 B.R. at 481–83.   The "leasehold" reference was removed in 1994 and is no longer in section 365(h).   *See* 11 U.S.C. § 365(h); Pub. L. 103-394 § 205(a) (Oct. 22, 1994) (enacting current formulation of section 365(h)).   *Chestnut Ridge* thus addressed statutory language that no longer exists.   Additionally, the various versions of section 365(h) reflect "a

---

[3]  NCM argues that *Mission Product* "confirm[ed]" that post-rejection, "a debtor remains contractually bound to *refrain* from taking actions that would violate a counterparty's surviving rights."  (NCM Opp'n ¶ 55; *see id.* ¶¶ 56, 63.)  This far overstates *Mission Product* and its implications.  *Mission Product* did not discuss what, if any, actions a debtor has to "refrain" from post-rejection.  While it may be implicit that a debtor cannot affirmatively interfere with a non-debtor's contractual right to act of the kind recognized in *Mission Product*, that case did not discuss or involve enforcing a standalone covenant against a debtor, as NCM seeks here.  The non-debtor in *Mission Product* wanted to use a trademark; the non-debtor law firm in the photocopier example wanted to use the photocopier.  Here, on the other hand, NCM disclaims any desire to take any action permitted under the ESA, and instead only seeks to enforce the debtor's contractual obligations.  Tellingly, NCM states that it would be satisfied if Regal simply stops running *any* advertisements.  (*Id.* ¶¶ 27, 30.)  This is merely another attempt by NCM to redefine Regal's performance obligations as NCM's own "right" to demand such performance.

remedial scheme *embellishing on or tweaking* the general rejection-as-breach rule." *Mission Product*, 139 S. Ct. at 1664 n.2. Importantly, whatever specific statutory rights may be preserved under a particular enactment of section 365(h), those provisions concern a non-debtor's rights in connection with using leased premises under a rejected lease, which is more analogous to *Mission Product*'s consideration of a non-debtor's post-rejection rights to use a trademark or a photocopier. As noted above, that is nothing like the ESA Provisions here. *Supra* ¶¶ 22–24.

26.     Similarly, NCM's citation to section 365(n)(1)(B) of the Bankruptcy Code does not support its arguments. Like section 365(h), section 365(n) provides specific statutory post-rejection rights by "embellishing on or tweaking the general rejection-as-breach rule." *Mission Product*, 139 S. Ct. at 1664 n.2. Section 365(n)(1)(B) in particular addresses the right to use a debtor's intellectual property post-rejection, and all it establishes is that if an *exclusive* intellectual property license was conveyed to the non-debtor, the retained post-rejection license remains exclusive. That is entirely consistent with *Mission Product*, which held that a non-debtor retains a *non*-exclusive trademark license post-rejection. In either case, the non-debtor retains a right to use its license, whether exclusive or not. Neither situation provides guidance here, where NCM is attempting to use a "right" solely to enforce Regal's own performance obligations.

27.     Notably, NCM cites few cases decided after *Mission Product*. (*See* NCM Opp'n ¶¶ 86–91.) It attempts to excuse this omission by claiming that, because *Mission Product* "was recently decided, few cases have applied its core holding to negative covenants like those in the Regal ESA." (*Id.* ¶ 86.) Not so. Courts have considered *Mission Product* in assessing whether exclusivity obligations would remain enforceable after rejection. In fact, Regal previously cited to several of these post-*Mission Product* cases (Mot. ¶ 48), which are directly on point. *E.g.*, *Nine Point,* 633 B.R. at 135-36 (finding that a debtor cannot be forced to perform pursuant to exclusivity

or other similar provisions post-rejection); *Southland Royalty*, 623 B.R. at 90 (finding that enforcement of an exclusivity provision would be "inequitable" when monetary damages could "fully compensate" the counterparty); *In re Extraction Oil & Gas*, 622 B.R. 608, 622 (Bankr. D. Del. 2020) ("[R]ejection relieves a trustee from performing covenants requiring future performance."); *Orama*, 601 B.R. at 349 ("It seems incongruous that the Bankruptcy Code would grant a debtor the right to reject (and thus breach) a contract while preserving the right of the counter-party to compel performance of the same contract.").  All of these cases have held that exclusivity terms would not remain enforceable post-rejection.

28.     The only two post-*Mission Product* cases NCM relies on are *In re Lager*, 2022 WL 3330421 (Bankr. N.D. Tex. Aug. 11, 2022) and *In re EllDan Corp.*, 2023 WL 175195 (Bankr. D. Minn. Jan. 12, 2023).  *Lager*, which NCM cited in prior briefing, is readily distinguishable for the reasons stated in Regal's Motion.  (Mot. ¶ 52.)  Moreover, to the extent that *Lager* concluded that the distinction between "affirmative" versus "negative" obligations was "***critical***," it cited no provision of the Bankruptcy Code or portion of *Mission Product* that endorsed such a conclusion. 2022 WL 3330421, at *10 (emphasis in original).  As discussed above, such a distinction cannot be found in those authorities and is untenable.  *Supra* ¶ 21.  *Lager* instead cited cases discussing dischargeability, 2022 WL 3330421, at *10 & nn.84–87, an issue that NCM argues is "irrelevant" and on the merits of which, in any event, NCM is wrong.  *See infra* ¶¶ 40–43.

29.     *EllDan* is also readily distinguishable because the court did not consider whether any contract provision would be unenforceable after rejection.  Rather, the court merely approved the debtor's rejection of the contract.  2023 WL 175195, at *3.  The court specifically instructed the parties to "commence an adversary proceeding" without expressing any opinion as to whether the disputed contract terms would remain in force after rejection.  *Id.*

12

**C.      NCM Attempts To Manufacture Irrelevant (And Undisputed) "Fact Issues"**

30.      NCM also incorrectly claims that Regal's position is that a debtor can refuse to comply with any contractual obligation if "non-compliance … is economically more attractive to a debtor than 'performing.'"  (NCM Opp'n ¶ 52.)  NCM then fights its own strawman, claiming there is a fact issue as to whether Regal would suffer economically if forced to perform the ESA Provisions.  In fact, these alleged "factual disputes" are neither necessary to decide the motion nor seriously disputed.

31.      *First*, the economic impact of continued performance on Regal is irrelevant to the Motion.  As explained above, forcing a debtor to comply with its pre-rejection contractual obligations is foreclosed, as recognized in *Mission Product*, without the need for an examination of economic impact.  *Supra* ¶ 9.  Regal noted that foregoing one of its revenue streams would affect its business, not because it is necessary to decide the Motion, but in response to NCM's prior attempts to distinguish *Nine Point*, and analogize to *Lager*, based on their facts and their discussion of any burdens placed on the debtors.  (*See* Mot. ¶ 55.)  Specifically, Regal noted that *Lager* had— on its highly distinguishable facts—found "[c]ompliance d[id] not affect the Debtors' business in any conceivable way."  (*Id.* (quoting  *Lager*, 2022 WL 3330421, at *11); NCM Opp'n ¶ 68 (misconstruing Mot. ¶ 55).)  The relevant point is that *Lager* is not only problematic in its reasoning, *supra* ¶ 28, but also distinguishable on its facts.  Regardless, the specific impact of performance on Regal's bottom line here is irrelevant.

32.      *Second*, NCM itself concedes that post-rejection enforcement of the ESA Provisions would impact Regal's business through "lost advertising revenue."  (NCM Opp'n ¶ 78.) NCM points to the following factual allegations, each of which it previously conceded:

- "Advertising revenue … is critical to Regal's business" and "represents the third-largest component of Cineworld's revenue, after box office admissions and retail sales."  (NCM Opp'n ¶ 39

(quoting Mot. ¶¶ 8, 56).)  NCM has acknowledged that screen advertising comprises "15 percent of [Regal's] revenue"[4] and that "[t]he average annual payment that NCM made to Regal from 2015 to 2019 was approximately $58 million."  (NCM Opp'n ¶ 24.)

- "[NCM] leaves the Debtor with no choice but to continue receiving advertising services through NCM and performing under the uneconomical terms of the ESA."  (NCM Opp'n ¶ 39 (quoting Mot. ¶ 42).)  NCM also conceded this point on the record, as it stated that the ESA is "a different type of contract" and "will prevent [Regal] from advertising with anyone else."[5] Indeed, NCM assumes "that the Debtors would generate no advertising revenue if Regal complied with the Negative Covenants."  (NCM Opp'n ¶ 77.)

- "[Enforcing the ESA Provisions after rejection] would 'fundamentally impair' the Debtor's restructuring efforts by forcing it to perform under a burdensome contract."  (NCM Opp'n ¶ 39 (quoting Mot. ¶ 47).)  The Court has held that NCM's mere interference with Regal's advertising rights could cause "irreparable injury to the estate."  (Temporary Restraining Order, *Regal Cinemas, Inc. v. National CineMedia, LLC*, No. 22-ap-03313 (Bankr. S.D. Tex. Nov. 1, 2022), ECF No. 7.)

33.     It is thus undisputed that Regal's advertising is a significant revenue source for the company, and that ceasing advertising operations would "affect [Regal's] business," even if that were a relevant consideration.

## II.     NCM'S AFFIRMATIVE DEFENSES DO NOT PRECLUDE SUMMARY JUDGMENT

34.     NCM also argues that Regal's Motion must be denied because "Regal does not mention, let alone address, NCM's affirmative defenses."  (NCM Opp'n ¶ 3.)  Specifically, NCM claims that a party moving for summary judgment must demonstrate that there is no genuine issue of material fact with respect to any affirmative defenses.  (*Id.* ¶ 49.)  NCM is mistaken.

---

[4] Transcript of Status Conference at 33:12, *In re Cineworld Group plc*, No. 22-90168 (Bankr. S.D. Tex. Jan. 4, 2023).

[5] *Id.* at 35:5, 13–14.

35.     As a preliminary matter, NCM's affirmative defenses are boilerplate equitable defenses of *in pari delicto* and unclean hands asserted against Regal's counterclaim, which seeks to declare the ESA Provisions void and unenforceable regardless of the effects of rejection.  (*See* NCM Answer (ECF No. 10) at 6.)  They do not apply to NCM's own claims for injunctive relief, which are also the subject of the Motion.  The affirmative defenses therefore cannot preclude summary judgment on the issue of whether the ESA Provisions are enforceable post-rejection.

36.     In addition, the boilerplate equitable defenses are not relevant to the Motion because, according to NCM, it is not currently seeking to enforce (and apparently does not contest summary judgment with respect to) the No-Negotiate Provision, which is the only provision it could possibly allege Regal has breached.  (NCM Opp'n ¶ 75 n.11 ("NCM is not currently seeking to enforce the restrictions on negotiating with third parties with respect to the provision of Advertising Services set forth in Section 9.01 of the Regal ESA.").)  That is likely because the Court expressly authorized Regal to negotiate for advertising services covered by the ESA, with NCM's consent.  (Order Extending Temporary Restraining Order, *Regal Cinemas, Inc. v. National CineMedia, LLC*, No. 22-ap-03313 (Bankr. S.D. Tex. Nov. 14, 2022), ECF No. 14.)  With no basis for an *in pari delicto* or unclean hands defense that has not already been rejected by the Court, these boilerplate defenses are no bar to granting the Motion with respect to both NCM's injunctive relief counts and Regal's counterclaim.

## III.     NCM'S REMAINING ARGUMENTS DO NOT PRECLUDE SUMMARY JUDGMENT IN REGAL'S FAVOR

37.     NCM's Opposition includes several other factually irrelevant or legally incorrect arguments that are readily rebutted. These include: (a) the alleged economic burden to NCM if the ESA Provisions are not performed; (b) the dischargeability of NCM's claims; and (c) NCM's arguments regarding Regal's fiduciary duties to its estate.

### A.     Any Alleged Economic Burden To NCM From Rejection Is Irrelevant

38.     As already discussed in the Motion, NCM raises the alleged "independent value" of the ESA Provisions to suggest that the facts of *Nine Point* are distinguishable.  (NCM Opp'n ¶¶ 99–101; *see also* Mot. ¶ 53.)  However, like NCM, the non-debtor in *Nine Point* unsuccessfully argued that the exclusivity provisions had "enormous value" because the terms "prohibit[] the Debtors from using any other party to perform the services [the non-debtor] provides—a right that continues to have value after rejection."   633 B.R. at 135.   The court found this argument unpersuasive because the provisions "are inoperative as a practical matter without the Debtors' post-rejection performance."  *Id.* at 136.  Thus, it was immaterial that the non-debtor expected a loss because, under *Mission Product*, the debtor's contractual obligations were unenforceable following rejection.

39.     In fact, "[n]othing in § 365(a) suggests that a court may limit a debtor's right to reject simply because rejection seems unfair to the rejected party.  *Every* opposed rejection of a contract probably meets that criteria."  *In re Ultra Petroleum Corp.*, 621 B.R. 188, 204 (Bankr. S.D. Tex. 2020) (emphasis in original), *aff'd,* 28 F.4th 629, 636 (5th Cir. 2022).  The same is true in this case.  As a matter of law, Regal is not prohibited from rejecting the ESA, and NCM cannot force Regal to perform under a rejected contract, simply because NCM may suffer a loss.

### B.     NCM's Only Remedy Arising From Regal's Breach Of The ESA Is A Dischargeable Claim

40.     NCM takes issue with Regal's observation that any post-rejection breach of the ESA Provisions gives rise to nothing more than a dischargeable prepetition claim, but at the same time suggests that "[t]his argument is . . . irrelevant to the Motion."  (NCM Opp'n ¶ 102.)  In its Motion, Regal discussed how the Bankruptcy Code provides—and *Mission Product* noted—that the deemed breach of a contract following rejection gives rise to a dischargeable prepetition claim.

11 U.S.C. § 365(g) (providing that rejection "constitutes a breach of such contract"); *id.* § 502(g)(1) (governing the allowance of any "claim arising from [a] rejection"); *Mission Product,* 139 S. Ct. at 1658 ("By thus giving the counterparty a pre-petition claim, Section 365(g) places that party in the same boat as the debtor's unsecured creditors . . . ."); *see also* Mot. ¶¶ 35–36. Regal also referenced the Bankruptcy Code's broad definition of "claim," which includes any "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment." 11 U.S.C. § 101(5)(B); *see also* Mot. ¶ 35. NCM does not meaningfully engage with this statutory framework, and instead argues that any post-rejection claim for breach is not dischargeable based on distinguishable or non-binding case law. (NCM Opp'n ¶¶ 102–12.) NCM is wrong.

41.     As NCM notes, the fact that rejection gives rise to a dischargeable prepetition damages claim does not determine whether NCM has a retained contractual right that survives rejection under *Mission Product* (such as the right to use a debtor's trademark). (NCM Opp'n ¶ 103.) But the fact remains that such a claim is the only post-rejection remedy available to NCM. As the Supreme Court made clear in *Mission Product*, following rejection, "[f]irst, [the debtor] could stop performing under the contract" and "second, [the non-debtor] could assert . . . a pre-petition claim in the bankruptcy proceedings." 139 S. Ct. at 1659. Here, Regal will stop performing under the ESA, and NCM will have a dischargeable prepetition claim. The only other step in *Mission Product*'s analysis is to assess whether NCM has a surviving contractual right independent of Regal's performance obligations. That is indeed a separate point, but as discussed earlier, NCM has *no* contractual right that survives rejection under *Mission Product*. *Supra* ¶¶ 22–24. Regal's performance obligations do not remain in effect after rejection, and NCM's only

remedy for the deemed breach of the ESA under section 365(g) of the Bankruptcy Code is a prepetition claim. Regal's Motion simply reiterated that such a claim is dischargeable.

42.     Because breaching the ESA Provisions "gives rise to a right to payment" *and* a "right to an equitable remedy," any right to an equitable remedy arising from the breach of the ESA is a dischargeable "claim" under the plain text of section 101(5)(B) of the Bankruptcy Code. NCM cites *Matter of Davis*, 3 F.3d 113 (5th Cir. 1993) in support of its argument, (NCM Opp'n ¶ 104), but *Davis* merely considered whether "alternate remedies of money damages exist[ed]" for the specific equitable remedies at issue, none of which bears any resemblance to specific performance of a contractual obligation. *Id.* at 116–17 (analyzing the availability of "alternate" money damages for state court judgment awarding equitable remedies of "resulting trust," "reformation," "partition in kind," receivership, and dissolution with respect to a real estate partnership). Here, Delaware *does* provide an "alternate remedy" of money damages for breach of the ESA Provisions, so any breach of those provisions is a "claim" under the plain text of section 101(5)(B) and *Davis*. *See, e.g.*, *Symbiont.io, Inc. v. Ipreo Holdings, LLC*, 2021 WL 3575709, at *53 (Del. Ch. Aug. 13, 2021) (noting that lost profits are "a standard measure of damages that courts deploy in cases involving breaches of restrictive covenants").[6]

43.     In arguing that a claim for specific performance of "negative" contractual obligations is non-dischargeable, NCM again attempts to distinguish between specific performance of "affirmative" versus "negative" obligations (and even argues that specific

---

[6]  To the extent the Court construes *Davis* or any other case law to impose requirements beyond those imposed by section 101(5)(B) and finds such additional requirements unsatisfied and determinative of the Motion, Regal reserves its right to challenge the validity of any such additional requirements. *Cf. In re U.S. Pipe & Foundry Co.*, 32 F.4th 1324, 1334 (11th Cir. 2022) ("[A] test that there be some close relationship between the equitable remedy and the right to payment conflicts with the text of section 101(5)(B). . . . Section 101(5)(B) directs us to consider only whether the same breach 'gives rise' to both the right to an equitable remedy and a right to payment."), *cert. pet. filed*, No. 22-115 (Aug. 1, 2022), *response requested* (Sept. 7, 2022), *views of Solicitor General invited* (Dec. 12, 2022).

performance of a negative obligation is not really specific performance).  (*See* NCM Opp'n ¶¶ 108–11.)  This purported distinction has no basis in case law or in the Bankruptcy Code's definition of a "claim."  The Fifth Circuit has observed that "[a]fter rejecting a contract, ***a debtor is not subject to an order of specific performance***."  *Gulfport Energy Corp. v. FERC*, 41 F.4th 667, 684 n.33 (5th Cir. 2022) (quoting *Sunbeam Prods., Inc. v. Chi. Am. Mfg., LLC*, 686 F.3d 372, 377 (7th Cir. 2012)); *see also Mission Product*, 139 S. Ct. at 1659 (following rejection, the debtor "could stop performing under the contract"); *see also* Mot. ¶¶ 35–36 (gathering cases).  Neither *Gulfport* nor *Mission Product* suggest that the right to seek specific performance of a rejected contract *is* available—or is not a "claim"—when sought to force a debtor to "refrain" from acting or to enforce a "negative" obligation.  The only reasoning consistent with the Bankruptcy Code is: whether a right to seek specific performance of a rejected contractual obligation gives rise to a dischargeable "claim" does not turn on the obligation's characterization as "negative" or not.  *See* Mot. ¶¶ 35–36; *see also, e.g.*, *In re Roberts*, 607 B.R. 635, 656 (Bankr. N.D. Ill. 2019) ("[I]n bankruptcy, the Franchise Agreement's covenant not to compete gives rise to a claim, not a right of specific enforcement.").

44.     Finally, NCM also claims that the parties "already contracted for a continuing right to injunctive relief upon breach." (NCM Opp'n ¶ 107.)  But the provision NCM cites makes clear it only applies to breaches of the confidentiality provision that is not at issue (Article 14) and the Non-Compete Provision (Section 12.07).  (Mot. Ex. 1, ESA § 14.02.)  There is no such language with respect to the Exclusivity Provision.  Moreover, whether a breach of the ESA gives rise to a dischargeable claim does not turn on whether, prior to rejection, an injunction might have *also* been available.[7]  Instead, the analysis asks whether money damages were available for such

---

[7]  The contractual provision alone does not entitle NCM to such relief.  Delaware courts have held that "[a] party … has no right to an injunction, which always remains a matter of judicial discretion, even when a contractual provision

breach.  *Supra* ¶¶ 40, 42.  Because money damages are available for any breach of the ESA resulting from rejection, such breach gives rise to a dischargeable claim as a matter of law.

### C.    NCM Ignores Regal's Fiduciary Duties To Its Estate

45.    A faithful application of section 365 of the Bankruptcy Code and *Mission Product* means that Regal will have no post-rejection performance obligations under the ESA Provisions. NCM also takes issue with Regal's separate and independent argument that the ESA Provisions are void as against public policy because they prohibit Regal from honoring its fiduciary duty to maximize value for its estate.  As this Court has already recognized, Regal has an established right and obligation to assess its contracts and maximize the value of its advertising services for the estate.  That is why Regal intends to pursue the best economic deal for its advertising services.[8] Regal is not, as NCM claims, suggesting that it has "carte blanche to cherry pick" from all its contractual provisions.  (NCM Opp'n ¶ 122.)  Rather, as many courts have held, Regal has a fiduciary duty to assess whether to reject the ESA.

46.    There are legitimate policy considerations "to maximize the value of the estate for the creditors," which have compelled courts to act in limited circumstances. *See In re Big Rivers Elec. Corp.,* 233 B.R. 739, 753 (W.D. Ky. 1998); *In re Rosenberg*, 495 B.R. 196, 202 (Bankr. E.D.N.Y. 2010) (finding that a debtor "cannot be bound by an agreement . . . that conflicts with the [debtor's] obligations under the Bankruptcy Code"); *In re IT Grp., Inc.*, 350 B.R. 166, 178 (Bankr. D. Del. 2006) (finding cross-default provision unenforceable because it "indirectly interferes with a debtor's ability to realize the value of its assets"); *In re Mitchell*, 249 B.R. 55, 60

---

states that injunctive relief is available or contains a stipulation to the existence of irreparable harm."  *XRI Inv. Holdings LLC v. Holifield*, 283 A.3d 581, 660–61 (Del. Ch. 2022).

[8]  Transcript of Status Conference at 35:12-14, 37:7, *In re Cineworld Group plc,* No. 22-90168 (Bankr. S.D. Tex. Jan. 4, 2023).

(Bankr. S.D.N.Y. 2000) (finding that enforcement of an exclusivity provision post-rejection would be "inappropriate" where an injunction to enforce the exclusivity provision could prevent the debtor from working for anyone other than the plaintiff).

47.     When it comes to the application of these general principles, there is at least one case on point—*Big Rivers*.  The court made clear that a bankruptcy court has equitable authority to void contract obligations to effectuate a debtor's fiduciary duties.  (Mot. ¶ 65 (quoting *Big Rivers*, 233 B.R. at 751–53).)  NCM takes the extreme position that Regal's fiduciary duties should be ignored entirely because the Court lacks authority to void the ESA Provisions.  NCM is mistaken.  While bankruptcy courts do not have unfettered equitable powers, they do have discretion to take equitable action consistent with the terms and purpose of the Bankruptcy Code.  As one court explained:

> The Supreme Court has long recognized that bankruptcy courts are equitable tribunals that apply equitable principles in the administration of bankruptcy proceedings. The enactment of the Code in 1978 increased the degree of regulation Congress imposed upon bankruptcy proceedings, but it did not alter bankruptcy courts' fundamental nature. Any lingering doubt on that point is dispelled by a string of post-enactment Supreme Court decisions … and by the Code itself.

*Off. Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 567 (3d Cir. 2003).

48.     The purpose of section 365 of the Bankruptcy Code is to "release the debtor's estate from burdensome obligations that can impede a successful reorganization."  *Bildisco*, 465 U.S. at 528. Nothing in the Bankruptcy Code prohibits a court from voiding a contract term that would prohibit a debtor from maximizing value for its estate, and *Big Rivers* endorses that result. Given the circumstances of this case, enforcing the ESA Provisions post-rejection would frustrate the purpose of the Bankruptcy Code.

## **<u>NOTICE</u>**

49.     Regal will provide notice of this Reply to the Plaintiff's counsel.  In light of the

nature of the relief requested, no other or further notice need be given.

WHEREFORE, Regal requests that the Court grant the relief requested in its Motion for

Summary Judgment and such other relief as the Court deems appropriate under the circumstances.

Houston, Texas
March 17, 2023

*/s/ Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Rebecca Blake Chaikin (TX Bar No. 24133055)
Veronica A. Polnick (TX Bar No. 24079148)
Vienna Anaya (TX Bar No. 24091225)
1401 McKinney Street, Suite 1900

Houston, TX 77010
Telephone:     (713) 752-4200
Facsimile:     (713) 752-4221
Email:     mcavenaugh@jw.com
               rchaikin@jw.com
               vpolnick@jw.com
               vanaya@jw.com

*Co-Counsel to the Debtors and Debtors in
Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Christopher Marcus, P.C. (admitted *pro hac vice*)
Christine Okike, P.C. (admitted *pro hac vice*)
Ciara Foster (admitted *pro hac vice*)
Josh Greenblatt, P.C. (admitted *pro hac vice*)

601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900
Email:     joshua.sussberg@kirkland.com
               christopher.marcus@kirkland.com
               christine.okike@kirkland.com
               ciara.foster@kirkland.com

- and -

William E. Arnault, P.C. (admitted *pro hac vice)*
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:   (312) 862-2200
Email:       william.arnault@kirkland.com

*Co-Counsel to the Debtors and Debtors in
Possession*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 17, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh